IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re THE LOEWEN GROUP INC. | : | CIVIL ACTION |
| SECURITIES LITIGATION | : | |
| | : | |
| | : | NO. 98-6740 |

O'NEILL, J.                                          November  9, 2005

MEMORANDUM

This is a class action in which plaintiffs allege that defendants committed securities fraud

in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§

78(b) and 78(t), and Securities and Exchange Commission Rule 10b-5, 17 C.F.R. § 240.10b-5.

Before me now is plaintiffs' motion for class certification, defendants' responses,[1] and plaintiffs'

reply thereto.

BACKGROUND

The factual background of this case can be found in my decisions of July 16, 2003, In re

The Loewen Group, Inc. Sec. Litig., No. 98-6740, 2003 WL 22436233 (E.D. Pa. July 16, 2003);

August 18, 2004, In re The Loewen Group, Inc. Sec. Litig., No. 98-6740, at 2004 WL 1853137

(E.D. Pa. Aug. 18, 2004); and October 18, 2005, In re The Loewen Group, Inc. Sec. Litig., No.

98-6740, at 2005 WL 2660349 (E.D. Pa. Oct. 18, 2005).  Nevertheless, I will discuss the relevant

facts here.

During the class period, The Loewen Group, Inc. ("TLGI") was the second largest

operator of funeral homes and cemeteries in North America and the largest operator of funeral

---

[1] The Loewen Group, Inc. has filed a reply brief joining in the arguments advanced by the individual plaintiffs contesting class certification.

homes in Canada.  Leading up to the class period, TLGI expanded its business focus away from funeral homes and increased its percentage of assets with the acquisition of a large number of pre-need cemetery businesses.

Plaintiffs broadly allege that TLGI, by and through the individual defendants, orchestrated a comprehensive scheme to defraud investors by proliferating false and/or misleading statements to the public in order to keep TLGI from being taken over by one of its main competitors, Service Corporation International ("SCI").  Although SCI withdrew its official takeover bid in January 1997, plaintiffs allege that defendant Raymond Loewen continued to pursue policies in order to position himself and TLGI to ward off a second SCI takeover bid.  At the current stage of the litigation, three major claims survive.  First, plaintiffs allege that defendants mislead investors by materially misstating the value of TLGI's businesses and properties.  Second, plaintiffs allege that defendants failed to record contingent losses on put/call agreements.  Third, plaintiffs allege that defendants failed to account properly for imputed interest on zero interest finance plans.

Plaintiffs allege that individual defendants knew, or were reckless in not knowing, that TLGI's assets were significantly overvalued on its balance sheet.  Plaintiffs support this allegation with TLGI's 1998 Form 10-K, in which TLGI reported that it sold a group of 124 cemeteries in 1998 at 39% of their book value during the class period.  Plaintiffs also allege that TLGI violated GAAP[2] and that individual defendants, due to their positions within TLGI, knew or were reckless in not knowing that TLGI was paying more than twice the EBITDA[3] factors for

_____

[2]Generally Accepted Accounting Principles ("GAAP").

[3]Earnings Before Interest, Taxes, Depreciation, and Amortization ("EBITDA").

its acquisitions, much more than any competing offers.  For example, plaintiffs assert that when TLGI purchased Osiris in 1995, a company that held several cemeteries and funeral homes, a significant portion of Osiris's acquisition price was assigned as a signing bonus to two of Osiris' principals, Lawrence Miller and William Shane, who then became TLGI executives.

Plaintiffs further allege that defendants' system of accounting for a series of transactions stemming from the 1996 put/call agreements with respect to certain acquired properties caused TLGI's balance sheet to be materially false and misleading.  Specifically, plaintiffs allege that TLGI's August 1996 acquisition of interests in Prime Succession, Inc., a privately-held funeral service company in North America, and November 1996 acquisition of interests in Rose Hills Memorial Park, the largest cemetery in North America, were executed through complicated finance transactions that were designed to keep the debt associated with acquiring the properties off TLGI's  balance sheet.  Plaintiffs allege that TLGI's statements regarding the accounting treatment of the put/call agreements, in which TLGI had the option to acquire Blackstone's interest in Prime Succession and Rose Hills, were fraudulent because defendants knew that it was likely that the put would be exercised by Blackstone.  Plaintiffs support these allegations with TLGI's 1996 and 1997 Form 10-K filings, in which TLGI stated that "it is not currently possible to determine whether Blackstone or the Company will exercise [the Put or Call] rights" and "it is not possible at this date to estimate the future amount that may be payable to Blackstone on the exercise of the Put or the Call."  In contrast to these statements, Prime Succession and Rose Hills stated publicly, in October 1996 and February 1997, that "[b]y virtue of the Put/Call Agreement, it is likely that the Company will become a wholly owned subsidiary of Loewen Group."

Plaintiffs also allege that defendants caused TLGI's financial results to be overstated by

failing to deduct required amounts for imputed interest on zero interest bearing cemetery accounts receivable from its assets and income reported in the first half of 1997 and first half of 1998, as required by GAAP.  In 1997, TLGI began a promotion focused on zero interest contracts for the sale of pre-need cemetery plots.  These contracts offered customers either a funeral service or burial at a guaranteed price in exchange for a small initial down payment and zero interest.  GAAP requires that companies "impute interest" when they offer no-interest installment contracts which last longer than one year.  According to the plaintiffs, TLGI's revenue and income were overstated by $6.5 million for the first and second quarters of 1997 and $3.1 million for the first quarter of 1998 due to TLGI's failure to deduct imputed interest.  While TLGI reported an increase of 2.4% in cemetery gross margins from the second quarter of 1996 to the second quarter of 1997, plaintiffs allege that if TLGI had deducted the imputed interest and provided an adequate reserve for accounts receivable the cemetery gross margin actually declined.  Plaintiffs also allege that, in November 1998, these accounting errors led to adjustments that changed a net gain into a net loss of millions of dollars.  Defendants do not deny using a no-interest payment plan or failing to account for imputed interest.

There were numerous publications during the class period that reported or reflected TLGI's revenue, income, and the value of its assets.  It is not disputed that defendants disclosed the company's financial figures to the Securities and Exchange Commission, to various securities analysts, and to the public directly.  The disclosures include press releases, interviews, and TLGI's Forms 10-K and Form 10-Q, Registration Statement, and Prospectus.  At all points during the class period TLGI stock was publicly traded on the New York Stock Exchange.

Defendants allege that the company disclosed the failure to account properly for imputed

interest on three occasions.  TLGI first disclosed a $13 million charge for imputed interest in its

November 14, 1997 SEC filing.  Defendants' second disclosure was in a March 11, 1998

Griffiths' Report.  The third disclosure was made in a November 5, 1998 press release issued by

TLGI.  None of the disclosures listed by the defendants had a significant effect on the price of

TLGI's stock.[4]  Plaintiffs dispute the disclosure dates suggested by defendants, and note that

additional disclosures were made by TLGI throughout the class period.  On September 15, 1997,

for example, TLGI disclosed $80 million charges for "reserves and other adjustments" while also

announcing strategic initiatives that would provide cost savings and other benefits.  On October

6, 1998, TLGI announced that third quarter earnings were expected to be significantly below

consensus analysts' forecasts for the company.  While neither announcement mentioned

adjustments regarding imputed interest, plaintiffs allege that both adjustments were a result of

improper accounting of imputed interest.

A few facts regarding each proposed representative plaintiff are also relevant to the class

certification analysis.

The City of Philadelphia first purchased TLGI stock on June 5, 1997, and continued

buying until March 1998.  The purchase prices ranged from $22.00 to $35.30.  The City first sold

TLGI stock in August 1997 and finished selling on August 1998.  The sale prices ranged from

$33.69 to $14.25.

Phil Schwartz first purchased TLGI stock in August 1998 and never fully liquidated his

holdings.  His first purchase occurred after TLGI's first disclosure correcting imputed interest

---

[4] On the dates of disclosure listed by the defendants, the price of TLGI stock either
increased or decreased slightly after the information was made available publicly .

accounting irregularities.

Terry Roberts first purchased TLGI stock in March 1998 and sold all his stock by December 1998. He lost over $500,000.00. His first purchase occurred after TLGI's first disclosure correcting imputed interest accounting irregularities. Defendants allege that Roberts received non-public information from industry insiders (casket and chemical company representatives), Roberts' son (a former employee of a TLGI-owned funeral home), and a then current employee of a TLGI-owned funeral home. Plaintiffs claim that Roberts never had access to information that was not available to the rest of the class. Roberts' information derived from articles in industry publications, news articles, and TLGI's SEC filings. According to the plaintiffs, any "inside" information received by Roberts only relayed the public news about TLGI and gave him no additional insight into the company's health.

Harley Puff first purchased TLGI stock in June 1997 and sold all her stock by December 28, 2001. Defendants allege that Puff received non-public information from a friend's father, Max Martinez, who told Puff that the stock was dropping because TLGI was paying too much for acquisitions. The plaintiffs assert that Puff reviewed publicly available documents and TLGI's SEC filings before investing. Puff has sworn under oath that Martinez did not tell her to buy the stock. She also asserts that she decided to hold her stock because of statements made by TLGI and its representatives.

PROCEDURAL HISTORY

This class action began in 1998 as a series of securities fraud cases brought by TLGI shareholders against officers and directors of the corporation as well as the corporation itself. In 1999 the cases were consolidated under Fed. R. Civ. P. 42(a) into the current class action.

Plaintiffs filed the consolidated class complaint on February 1, 2002.  In July 2003, the original

class complaint was dismissed, with two of the plaintiffs' allegations dismissed with prejudice.

In September 2003, plaintiffs filed a corrected consolidated amended class action complaint,

which the defendants once again moved to dismiss.  After review, I granted defendants' motion

to dismiss regarding some of plaintiffs' claims.  The remaining claims are: (1) the § 10(b) claim

of materially misleading reporting of the value of Loewen Group's businesses and properties, (2)

the § 10(b) claim of failure to account properly for imputed interest on zero interest finance

plans, (3) the § 10(b) claim of failure to record contingent losses on the put/call agreements with

Blackstone regarding the Prime Succession and Rose Hill investments, and (4) the § 20(a) claims

related to those three § 10(b) claims.  Discovery has begun and plaintiffs have served document

requests on defendants and are in the process of issuing subpoenas to third-parties for relevant

documents.  I have denied defendants' motion for partial summary judgment on the imputed

interest claim.

     Plaintiffs seek to maintain this action as a class action under Rule 23(b)(3).  The proposed

class consists of all persons who purchased or otherwise acquired Loewen Group publicly traded

common stock, preferred stock, call options, or Monthly Insured Preferred Securities on the open

market from March 5, 1997 through January 14, 1999, inclusive, and who were injured thereby.

Excluded from the class are defendants Loewen Group, Raymond Loewen, and Paul Wagler,

directors and officers of Loewen Group during the class period, members of the immediate

family of any excluded party, and any person, firm, trust, corporation, officer, director, or other

individual or entity in which any excluded party has a controlling interest or which is related to or

affiliated with any of the excluded parties, including legal representatives, agents, affiliates,

heirs, successors-in-interest, or assigns of any such excluded party.  Defendants claim that the

class fails to meet two requirements of Rule 23(b)(3), typicality and adequacy of representation,

and argue that the class period is inconsistent with the remaining allegations in the case.

DISCUSSION

1. Overview of Section 10(b)

Every class certification review begins with an analysis of the underlying cause of action.

Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 172 (3d Cir. 2001).  To

state a claim for securities fraud under Section 10(b), plaintiffs must establish that defendants

"(1) made a misstatement or an omission of a material fact (2) with scienter (3) in connection

with the purchase or sale of a security (4) upon which the plaintiff reasonably relied and (5) that

the plaintiff's reliance was the proximate cause of his or her injury."  In re Ikon Office Solutions,

Inc. Sec. Litig., 277 F.3d 658, 666 (3d Cir. 2002).

In ordinary securities fraud cases, the burden is on the plaintiff to prove that he purchased

or sold stock in reliance on the defendant's misrepresentations.  In recent years, the Supreme

Court and the Court of Appeals have adopted the "fraud on the market" theory to create a

presumption of reliance in securities fraud cases.  Under this theory, an plaintiff is entitled to

three presumptions: (1) the market price of the security incorporated the alleged

misrepresentations, (2) the plaintiff relied on the market price as an indicator of the security's

value, and (3) the plaintiff acted reasonably in relying on the security's market price.  Semerenko

v. Cendant Corp., 223 F.3d 165, 179 (3d Cir. 2000); see also Basic, Inc. v. Levinson, 485 U.S.

224, 248-49 (1988); McNichols v. Loeb Rhoades & Co., Inc., 97 F.R.D. 331, 336-38 (N.D. Ill.

1982).  In fraud on the market cases, "the price at which a stock is traded is presumably affected

by the fraudulent information, thus injuring every investor who trades in the security." Newton,
259 F.3d at 179.  The presumption of reliance can be rebutted by showing that (1) the market did
not respond to the alleged misrepresentations, (2) the plaintiff did not rely on the market price
when making his investment decision, or (3) the plaintiff's reliance was unreasonable.
Semerenko, 223 F.3d at 179; see also Zlotnick v. Tie Commc'ns., 836 F.2d 818, 822 (3d Cir.
1988).

2. Class Certification

     A party seeking class certification bears the burden of proving that the proposed class
action satisfies the requirements of Federal Rule of Civil Procedure 23.  Johnston v. HBO Film
Mgmt., Inc., 265 F.3d 178, 183-84 (3d Cir. 2001).  Plaintiffs must satisfy the four prerequisites
of Rule 23(a) and show that the action can be maintained under at least one of the subsections of
Rule 23(b).  Id.; see Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 613-14 (1997).  Before I
begin my analysis, I also recognize that "the interests of justice require that in a doubtful case . . .
any error, if there is to be one, should be committed in favor of allowing a class action."  Kahan,
424 F.2d at169 quoting Esplin v. Hirschi, 402 F.2d 94, 101 (10th Cir. 1968).

     The Court of Appeals has recognized the utility, and often necessity, of looking beyond
the pleadings at the class certification stage of litigation.  See Newton, 259 F.3d at 168-69 ("In
reviewing a motion for class certification, a preliminary inquiry into the merits is sometimes
necessary to determine whether the alleged claims can be properly resolved as a class action.").
Despite that review, "it is not necessary for the plaintiffs to establish the merits of their case at
the class certification stage" and "the substantive allegations of the complaint must be taken as
true."  Chiang v. Veneman, 385 F.3d 256, 262 (3d Cir. 2004).

9

A.      The Requirements of Rule 23(a)

To be certified as a class, plaintiffs must satisfy Federal Rule of Civil Procedure 23(a).

Rule 23(a) provides:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Commonly referred to as numerosity, commonality, typicality, and adequate representation, these four requirements are "meant to assure both that class action treatment is necessary and efficient and that it is fair to the absentees under the particular circumstances." Baby Neal v. Casey, 43 F.3d 48, 55 (3d Cir.1994).  Plaintiffs contend that each of the proposed classes meets all four of the Rule 23(a) prerequisites.  Although defendants challenge only the typicality and adequate representation requirements, I will analyze each element.

1.      Numerosity

"Numerosity requires a finding that the putative class is so numerous that joinder of all members is impracticable." Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 182 (3d Cir. 2001); Fed. R. Civ. P. 23(a)(1).  "No magic number exists satisfying the numerosity requirement." Moskowitz v. Lopp, 128 F.R.D. 624, 628 (E.D.Pa.1989).  However, the Court of Appeals has generally approved of classes of forty or more.  See Stewart v. Abraham, 275 F.3d 220, 226-27 (3d Cir. 2001).  The number of plaintiffs makes this case appropriate for class certification because joinder would be impracticable.  TLGI was a nationally traded security with over 50 million shares outstanding at the start of the proposed class period. Millions of shares were traded during the class period by thousands of geographically-diverse

10

shareholders.  While the exact number of shareholders has not been determined at this stage of the litigation, the difficulty of attaching each shareholder and involving him in the litigation is impracticable. Therefore, I find that the numerosity requirement is satisfied.

2.     Commonality

To satisfy the commonality requirement, plaintiffs must show the existence of at least one question of law or fact common to the class. Fed. R. Civ. P. 23(a)(2); Johnson v. HBO Mgmt., Inc., 265 F.3d 178, 184 (3d Cir. 2001).  "Commonality does not require an identity of claims or facts among class members; [i]nstead, the commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class."  Id. at 184 (internal quotations omitted).  All that is required is that the litigation involve some common questions and that plaintiffs allege harm under the same legal theory.  See Baby Neal, 43 F.3d at 58.  With respect to the related criteria of commonality and typicality, the Court of Appeals has recognized that courts have "set a low threshold for satisfying both requirements."  Newton, 259 F.3d at 183.

Plaintiffs allege that TLGI, through the individual defendants, "orchestrated a common scheme to defraud investors by proliferating false and/or misleading statements to the public." Common legal and factual questions include whether defendants violated securities laws, whether TLGI reports and other statements issued to the public misrepresented or omitted material facts, and whether defendants acted knowingly or recklessly.  All plaintiffs, both individual representatives and members of the class, seek to establish the defendants' fraudulent course of conduct.  These common questions satisfy the commonality requirement of Rule 23(a)(2).

3.      Typicality

Although they remain distinct requirements, commonality and typicality tend to merge.

See Stewart v. Abraham, 275 F.3d 220, 227 (3d Cir.2001) ("[B]oth criteria seek to assure that the

action can be practically and efficiently maintained and that the interests of the absentees will be

fairly and adequately represented.").  To satisfy typicality, "the claims of the class representatives

must be typical of the class as a whole." Johnston, 265 F.3d at 184.  In other words, the plaintiffs

must show that the class representatives have legal interests such that pursuit of their own goals

will benefit the entire class.  See Eisenberg v. Gagnon, 766 F.2d 770, 786 (3d Cir. 1985).  Even if

there are pronounced factual differences among the plaintiffs, typicality is satisfied as long as

there is a strong similarity of legal theories and the named plaintiffs do not have unique

circumstances.  Johnston, 265 F.3d at 184 ("Indeed, so long as the claims of the named plaintiffs

and putative class members involve the same conduct by the defendant, typicality is established

regardless of factual differences.") (internal quotations omitted); Hoxworth v. Blinder, Robinson

& Co., Inc., 980 F.2d 912, 923 (3d Cir.1992) ("Factual differences will not render a claim

atypical if the claim arises from the same event or practice or course of conduct that gives rise to

the claims of the [absent] class members, and if it is based on the same legal theory."); see also In

re Resource Am. Sec. Litig., 202 F.R.D. 177 (E.D. Pa.2001).  Typical does not mean identical

and if necessary, a court may sever claims or use subclasses to treat individual issues separately.

Eisenberg, 766 F.2d at 786.

a. Dates of Disclosure–Imputed Interest Charges

Defendants argue that the dates of disclosure regarding the imputed interest charges

create intra-class conflicts of interest involving two of the representative plaintiffs, Phil Schwartz

12

and Terry Roberts.  Defendants allege that lead plaintiff Schwartz cannot represent the class

regarding imputed interest because he purchased his shares of TLGI on August 5, 1998, months

after TLGI's first corrective disclosure on imputed interest.  They also claim that Roberts cannot

represent the class regarding imputed interest because he purchased his shares of TLGI in March

1998, also after TLGI's first corrective disclosure.  Both Schwartz and Roberts, defendants argue,

will be motivated to minimize the impact of the imputed interest accounting irregularities and

focus on the other allegations in the complaint to the detriment of the rest of the putative class.

Defendants's arguments fail, however, because the plaintiffs allege a comprehensive

scheme of behavior by the defendants.  Regardless of the dates of disclosure for the imputed

interest accounting improprieties, there is no intra-class conflict.  The plaintiffs are alleging a

comprehensive fraudulent scheme which began before March 5, 1997 and continued throughout

the class period.  Defendants admit that the final disclosure date was April 14, 1999, three

months after the class period ended.  The plaintiffs, in attempting to prove this continuing

scheme, will succeed only by demonstrating its existence throughout the class period.  As the

Court held in In re Honeywell:

> Every Plaintiff will have an interest in determining that all the statements at issue
> (especially all those made before he or she bought) were both false and material
> and were made with scienter.  A Plaintiff even benefits from proof that materially
> false statements were made with scienter after his or her purchase–if only because
> such a showing aids his or her effort to prove scienter as to the whole scheme.

211 F.R.D. 255, 267 (D.N.J. 2002).  In any securities fraud case, each class member will want to

argue that the price was most inflated when he purchased the stock and least inflated (or not

inflated at all) when he sold it.  Acceptance of defendants' arguments would result in the

elimination of class certification as a remedy in securities fraud cases.  Therefore, minor factual

differences between the plaintiffs` dates of purchase will not preclude class certification.[5]

At this point in the litigation, all plaintiffs are advocating the same theory of recovery: that defendants' prolonged course of fraudulent conduct continued throughout the class period and served to artificially inflate TLGI securities for the entire period.  There are no separate theories of recovery.  Further, even if Schwartz and Roberts should attempt to minimize the impact of the imputed interest allegations, the remaining representative plaintiffs will ensure that any purchasers before March 1998 will be protected.  Both the City of Philadelphia and Harley Puff purchased TLGI securities before any disclosures regarding imputed interest accounting irregularities.  In pursuing litigation and reviewing settlement offers the representative plaintiffs must act together, and Puff and the City should balance any conflicts Schwartz and Roberts may have.

b. Non-public Information–Reliance

Defendants also assert that lead plaintiffs Roberts and Puff should not be appointed class representatives because they allegedly received and relied upon non-public information, thus rebutting the fraud on the market theory of reliance.  In some circumstances, a plaintiff subject to a unique defense is not an appropriate class representative.  See In re Linerboard Antitrust Litig., 203 F.R.D. 197, 211 (E.D. Pa. 2001); see also In re Initial Public Offering Secur. Litig., 227 F.R.D. 65, 87 (S.D.N.Y. 2004).  If the litigation threatens to be dominated by an arguable defense or defenses of a named plaintiff or a small subclass, the named plaintiff should not be a class

---

[5] Further, at this point in the litigation, the actual imputed interest disclosure dates are far from definite.  For an analysis of the plaintiffs' and defendants' suggested dates of disclosure, see my motion denying partial summary judgment: In re The Loewen Group, Inc. Sec. Litig., No. 97-6740, at 2005 WL 2660349 (E.D. Pa. Oct. 18, 2005).

representative.  In re Linerboard Antitrust Litig., 203 F.R.D. 197, 211 (E.D. Pa. 2001) citing

Koos v. First Nat. Bank of Peoria, 496 F.2d 1162, 1164 (7th Cir. 1974).  No plaintiffs are exactly

alike, however, and even with minor factual differences concerning defenses the typicality prong

can still be met.  To preclude class certification, the unique defense must be a major focus of the

litigation.  In re Rent-Way Secur. Litig., 218 F.R.D. 101, 113 (W.D. Pa. 2003).

Questions of individual reliance on oral and non-uniform written misrepresentations can

make class treatment inappropriate.  See Johnston, 265 F.3d at 190-92 (recognizing oral and

varied representations require individual treatment); In re LifeUSA Holding Inc., 242 F.3d 136,

146 (3d Cir.2001) (determining individual reliance on sales presentations that were not standard,

uniform, or scripted precluded class certification); see also Newton, 259 F.3d at 172 ("If proof of

the essential elements of the cause of action requires individual treatment, then class certification

is unsuitable.").  In Johnston, a putative RICO class action predicated on securities fraud, the

plaintiffs alleged the defendant motion picture production company defrauded investors by oral

and written statements that Michael Douglas, a movie star, would promote the production

company's products.  265 F.3d at 181-82.  Because most of the representations were oral, and the

sales pitches varied for each purchaser, plaintiffs were not entitled to a presumption of reliance

and each had to demonstrate individual reliance upon the defendant's affirmative

misrepresentations.  Id. at 190-91.  Moreover, the Court determined that without proof of

uniformity in the alleged oral and written misrepresentations it would be difficult to determine

whether or to what extent the alleged misrepresentation facilitated or influenced the fraud.  Id. at

191.  The Court of Appeals thus concluded that "adjudication of plaintiffs' claims necessarily

would require an individualized analysis of each claim, including the form of the

misrepresentation, whether it was relied upon, and the availability of any defenses." Id. at 194.

Accordingly, the Court affirmed the denial of class certification under Rule 23(b)(3). Id.

Other courts have also chosen not to certify classes because of atypical plaintiffs with unique defenses. See, e.g., Landry v. Price Waterhouse Chartered Accountants, 123 F.R.D. 474, 477 (S.D.N.Y. 1989); McNichols v. Loeb Rhoades & Co., Inc., 97 F.R.D. 331, 347 (N.D. Ill. 1982). In Landry, three potential representative plaintiffs were deemed atypical because they received information from directors of the defendant company. 123 F.R.D. at 476. In McNichols, the first atypical plaintiff asserted both a fraud on the market claim and a claim based on oral representations made by his account executive, an employee of the defendant. 97 F.R.D. at 340-41. The existence of the two separate claims created a conflict between the class representative and the putative class; the representative was atypical because of his focus on the alternate claim. Id. The second atypical plaintiff in McNichols was a market maker, a dealer who furnishes price quotations and is "ready, willing, and able" to trade reasonable quantities upon request. Id. at 345-46. This representative's status as a market-maker created an arguable defense to reliance, which threatened to consume a significant amount of time and energy. Id. at 346. In each of these cases, the proposed representative plaintiff was disqualified because of his or her interactions with high level employees of the defendant or exceptional additional insight into the market. The case at hand is different.

Roberts, according to defendants, received non-public information from industry insiders, Roberts' son, and a TLGI employee. Plaintiffs argue that the information Roberts received was entirely consistent with public information on the company at the time, did not reveal any inside information, and merely reiterated the information publicly disclosed by TLGI. Further,

16

plaintiffs assert that if Robert had received inside information about the company's status he would have sold his stock immediately and made no further purchases.

According to defendants, Puff is also an inappropriate class representative because she received inside information regarding TLGI.  Defendants allege that Puff received non-public information from a friend's father, Max Martinez, who told Puff that the stock was dropping because TLGI was paying too much for acquisitions.  Plaintiffs deny this allegation, asserting that Puff reviewed publicly available documents and TLGI's SEC filings before investing, and Puff has sworn under oath that Martinez did not tell her to buy the stock.  She also asserts that she decided to hold her stock only because of publicly available information in the form of public statements made by TLGI and its representatives.

Plaintiffs rely on the fraud on the market theory to prove reliance.  In this case, each class member, including each proposed representative plaintiff, is entitled to a presumption of reliance.  Neither plaintiff received information from top TLGI executives and both testified that they relied on the information publicly presented by the defendants in deciding to invest in TLGI securities.  Defendants argue that plaintiffs Puff and Roberts are not entitled to the fraud on the market presumption because they allegedly relied on non-public information, not the market price, in making their investment decisions.  Neither proposed representative, however, has asserted anything but full reliance on the integrity of the market price.  Both continued to hold stock despite their alleged insight into TLGI's ever-diminishing financial health.

The attacks on Puff and Roberts as class representatives are minor compared to the main theme of the litigation, the defendants' fraudulent scheme.  As the Court of Appeals analyzed in a similar case, "Since all members of the class would need to demonstrate the existence of this

scheme, their interests are sufficiently aligned that the class representatives can be expected to adequately pursue the interests of the absentee class members." In re The Prudential Insur. Co. of America Sales Practices Litig., 148 F.3d 283, 312 (3d Cir. 1998).  At this time, the potential defenses do not jeopardize a considerable amount of the lead plaintiffs' time or threaten to become a major focus of the litigation.  The major focus of the litigation is demonstrating the existence of the scheme and its fraudulent nature.  Any individual reliance issues, due to the fraud on the market presumption, are minor at this point.  Should they become a problem, I can and may remove Puff and Roberts as representative plaintiffs and continue the litigation with Phil Schwartz and the City of Philadelphia as lead plaintiffs.

All members of the putative class are pursuing the same legal theory of securities liability against TLGI and the individual defendants.  The alleged cause of their injury is typical throughout the class.  Common themes prevail, and no individual issue or defense threatens to overwhelm the litigation.  Each named plaintiff and putative class member needs to demonstrate the existence of TLGI's overarching scheme, regardless of when they purchased or sold TLGI securities.  Therefore, plaintiffs satisfy the typicality requirement of Rule 23(a)(3).[6]

4.      Adequacy of Representation

Class representatives must "fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  The adequate representation requirement of Rule 23(a)(4) guarantees "that the representatives and their attorneys will competently, responsibly, and vigorously prosecute the suit and that the relationship of the representative parties' interests to those of the class are

_____

[6] Defendants also argue that the fraud on the market presumption of reliance is rebutted because the market did not react in any significant way to TLGI's imputed interest disclosures. As discussed above, the imputed interest disclosure dates are disputed.

such that there is not likely to be divergence in viewpoint or goals in the conduct of the suit."

Bogosian v. Gulf Oil Corp., 561 F.2d 434, 449 (3d Cir.1977).  Adequacy of representation

depends on the circumstances surrounding each case.  Wetzel v. Liberty Mutual Ins. Co., 508

F.2d 239, 247 (3d Cir. 1974).  The burden is on the defendant to prove that the representative

plaintiffs will not adequately represent the class.  See Shamberg v. Ahlstrom, 111 F.R.D. 689,

693 (D.N.J. 1986); see also Lewis v. Curtis, 671 F.2d 779, 788-89 (3d Cir. 1982).  I must

therefore determine "whether the representatives' interests conflict with those of the class and

whether the class attorney[s] [are] capable of representing the class."  Johnston v. HBO Mgmt.,

Inc., 265 F.3d 178, 185 (3d Cir. 2001).

    First, counsel for each of the plaintiff classes in this litigation are experienced in

securities fraud disputes and complex litigation.  They have vigorously pursued this action,

preparing memoranda and conducting appropriate discovery.  There have been no allegations that

counsel have any interests that run counter to those of the plaintiff class.

    Defendants argue that there is a divergence in interests between the class representatives

and the class members, which would defeat class certification.  I have analyzed this argument

under the typicality prong.  As I discussed there, the alleged divergence in interest is minor, and

is will not prevent the representative class members from fully and adequately representing the

class.  Each representative plaintiff will attempt to prove that the defendants perpetrated a

prolonged course of conduct that continued throughout the class period and served to artificially

inflate TLGI securities for the entire period.  I conclude that the four proposed representative

plaintiffs, while having slightly divergent interests, will be able to work together in the best

interests of the class.  Adequate representation under Rule 23(a)(4) is therefore satisfied.

B.      Rule 23(b)

In addition to satisfying Rule 23(a), plaintiffs must show that each putative class falls under at least one of the three subsections of Rule 23(b).  In this case, plaintiffs claim that the proposed classes qualify under Rule 23(b)(3), which requires that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."  Fed. R. Civ. P. 23(b)(3).  To assist in this inquiry, I should consider: "(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum."  Id.  The Advisory Committee Note states that this subpart "encompasses those cases in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results."  As an example, the Advisory Committee states that a case involving fraud "perpetrated on numerous persons by the use of similar representations" can be certified under Rule 23(b)(3) even if damages have to be determined individually.

1.      Predominance of Common Questions

In order for plaintiffs to maintain a class action under Rule 23(b)(3), plaintiffs must demonstrate that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members."  Fed. R. Civ. P. 23(b)(3).  The Rule 23(b)(3) requirement that common issues predominate insures that a proposed class is "sufficiently

cohesive to warrant certification." <u>Newton</u>, 259 F.3d at 187.  Plaintiffs need not have identical

claims to be certified as a class, but if the facts present individual questions these must be

outweighed by common ones.  The predominance requirement of Rule 23(b) is more rigorous

than the commonality requirement of Rule 23(a).  <u>McMahon Books, Inc. v. Willow Grove</u>

<u>Associates</u>, 108 F.R.D. 32, 35 (E.D. Pa. 1985).  As the Supreme Court has held: "Predominance

is a test readily met in certain cases alleging consumer or securities fraud . . . .  The Committee's

warning, however, continues to call for caution where individual stakes are high and disparities

among class members great."  <u>Amchem Products, Inc. v. Windsor</u>, 521 U.S. 591, 625 (1997)

(holding that although a proposed class of asbestos plaintiffs shared the goal of reaching a

settlement the commonalities did not predominate over individual questions of causation

regarding each plaintiff's degree of asbestos exposure under different conditions, pre-existing

medical conditions, and tobacco use).  <u>See also</u> <u>Windham v. Am. Brands, Inc.</u>, 565 F.2d 59, 68

(4th Cir.1977) ("[W]here the issue of damages and impact ... requires separate minitrials ...

courts have found that the staggering problems of logistics thus created make the damage aspect

of the case predominate.") (internal citations omitted).

       Although the commonality requirement may be less rigorous than the requirements of

Rule 23(b)(3), for the reasons stated above regarding commonality, I find that questions of law

and fact common to the putative class members predominate over issues pertaining to individual

representative plaintiffs.  Moreover, the predominant issues relate to all putative class members

as individual defendants' alleged comprehensive scheme to defraud stockholders affected each

putative member, the only divergence being the extent and calculation of damages as to each

individual.  These damages calculations will not require an enormous amount of additional

information; upon settlement or resolution of the liability portion of the litigation, we can derive a formula for determining damages.  Further, no individual reliance determinations will be necessary if the plaintiffs successfully use the fraud on the market theory.  Accordingly, plaintiffs have met the predominance requirement.

2.      Superiority

The requirement that a class action be the superior method of resolving the claims insures that there is no other available method of handling it which has greater practical advantages.  See Fed. R. Civ. P. 23, Advisory Committee Note, 1966 Amendment to 23(b)(3).  In considering superiority, I may consider alternatives to class certification such as holding separate trials with combined discovery or certifying the class with respect to liability but not damages.  "A class action must represent the best available method for the fair and efficient adjudication of the controversy."  Johnston v. HBO Mgmt., Inc., 265 F.3d 178, 194 (3d Cir. 2001) (internal quotations omitted); see also Fed. R. Civ. P. 23(b)(3).  In considering superiority, I must address "the difficulties likely to be encountered in the management of a class action," Fed. R. Civ. P. 23(b)(3)(D), and I may consider alternatives to class certification, such as holding separate trials with combined discovery or certifying the class with respect to liability, but not damages.  See Johnston, 265 F.3d at 194.

Class actions are particularly appropriate in securities cases.  Eisenberg v. Gagnon, 766 F.2d 770, 785 (3d Cir. 1985).  Because the damages suffered by each investor are often small and investors are both numerous and geographically diverse, the Court of Appeals has noted that "the effectiveness of the securities laws may depend in large measure on the application of the class action device."  Id. quoting Kahan v. Rosenstiel, 424 F.2d 161, 169 (3d Cir. 1970).  Resolving

each of the claims against TLGI separately would usurp considerable judicial resources, involving thousands of separately filed claims in dozens of jurisdictions.  Each plaintiff, in each lawsuit, would attempt to prove the same conduct, that the defendants orchestrated a comprehensive scheme to defraud investors.  Considering the facts of this case from the perspectives of the judicial system, the potential class members, the parties, and the public at large, I conclude that the economies of time, effort, and expense are best served by class certification.

I find that the proposed classes satisfy the standards for class certification under Federal Rule of Civil Procedure 23, meeting the requirements of numerosity, commonality, typicality, adequate representation, predominance of common questions, and superiority of the class action as compared to other available methods.  I will certify the class.

C. Appropriate Class Period

Defendants also challenge the proposed class period offered by the plaintiffs.  Instead of the March 5, 1997 to January 14, 1999 class period, the defendants advocate three separate subclasses, one for each separate remaining offense: (1) An overvaluation of acquisitions class that begins on March 15, 1997 and ends on November 5, 1998 . . . ; (2) A Prime and Rose Hills put/call class that begins on March 15, 1997 and ends on April 14, 1999 . . . ; and (3) An imputed interest class that begins on May 5, 1997 and ends on November 14, 1997.  Each proposed subclass ended on the defendants' alleged disclosure dates.  They advocate the three separate subclasses because of the distinct nature of each of the remaining claims.

Plaintiffs respond by arguing that the differences between the remaining claims do not make the claims atypical or subclasses necessary.  Instead, plaintiffs focus on the defendants'

alleged comprehensive scheme, which began before the start of the class period and continued until after the proposed end date.  As I discussed above, plaintiffs have every incentive to prove the existence of this scheme throughout the class period, and the differences between the purchase and sell dates of the proposed representative plaintiffs do not make their claims atypical.  Therefore, there is no need to create subclasses at this time.

Class certification is always subject to review and re-evaluation by a trial court.  <u>See</u> Rule 23(c)(1).  If, in the future, subclasses or changes in the class period are necessary, I may act accordingly.  <u>See</u> <u>In re Corel Corp Inc. Sec. Litig.</u>, 206 F.R.D. 533, 544 (E.D. Pa. 2002); <u>see also</u> <u>Barnes v. American Tobacco Co.</u>, 161 F.3d 127, 140 (3d Cir. 1998).

An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

In re THE LOEWEN GROUP INC. :   CIVIL ACTION
SECURITIES LITIGATION   :
           :
           :    NO. 98-6740

<u>ORDER</u>

AND NOW, this 9th day of November 2005, after consideration of the plaintiffs' motion for class certification, defendants' response, and plaintiffs' reply, and for the reasons set forth in the accompanying memorandum, I find that the requirements of Rule 23(a) and Rule 23(b)(3) are met and therefore it is hereby ORDERED that the Motion is GRANTED as follows:

1. The Class is defined as: All persons or entities who purchased or otherwise acquired Loewen Group publicly traded stock, preferred stock, call options, or Monthly Insured Preferred Securities on the open market from March 5, 1997 through January 14, 1999, inclusive, and who were injured thereby.  The Class excludes defendants The Loewen Group, Inc., Raymond Loewen, and Paul Wagler, directors and officers of the Loewen Group during the Class Period, members of the immediate family of any excluded party, and any person, firm, trust, corporation, officer, director, or other individual or entity in which any excluded party has a controlling interest or which is related to or affiliated with any of the excluded parties, including legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

2. The following persons are hereby certified as the representatives of the Class: City of Philadelphia, through its Board of Pensions and Retirement, Phil Schwartz, James McGlathery, Terry Roberts, and Harley Puff.

3. In accordance with Fed. R. Civ. P. 23(g), the law firms of Berger & Montague, P.C., Wolf Popper LLP, and Abbey Gardy, LLP are appointed as class counsel, and Barrack, Rodos & Bacine is appointed as Liaison Counsel.

4. The parties shall present to the Court, as soon as practicable, a proposed order directing Class Notice and a form of Notice

5. This Order is conditional and without prejudice to any party's right to move to alter, amend, or decertify this class or to raise issues concerning the class.  See Fed.R.Civ.P. 23(C)(1).

s/Thomas N. O'Neill, Jr.
THOMAS N. O'NEILL, JR., J.